UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                                      Case No. 1:20-cr-190-1

v.

                                      HON. JANE M. BECKERING

BRIAN DEWAYNE DARDEN-
MOSBY,

     Defendant.

_____/

**OPINION**

A September 22, 2021 Second Superseding Indictment charges Defendant, Brian Dewayne Darden-Mosby, with two counts of Bank Fraud (ECF No. 185).[1]  The charges stem from evidence obtained during an October 27, 2020 traffic stop of a vehicle in which Defendant was a passenger. Pending before the Court is Defendant's December 2, 2021 Motion to Suppress (ECF No. 199), seeking to suppress evidence of two bank envelopes containing cashier's checks and $2,500 cash that were seized from his coat pocket during a search of his person.  The Government filed a Response in opposition on December 28, 2021 (ECF No. 205).  Defendant did not file a reply brief.  On February 24, 2022, the Court heard testimony from Detectives Dennis Pittman and Alexander Fox of the Kent Area Narcotics Enforcement Team (KANET), who were present at the time of the traffic stop, and DEA Special Agent Alexis Guidice, who reported to the scene of the traffic stop shortly after the search of Defendant.  After careful consideration of the hearing

---

[1] Four other counts in the Indictment are not relevant to and will not be affected by the outcome of the motion before the Court.

1

testimony and the parties' written and oral arguments, the Court denies Defendant's Motion to Suppress for the reasons set forth below.

## I.    FACTUAL BACKGROUND

On October 27, 2020, Defendant was a front-seat passenger in a Chevrolet Suburban owned and driven by Eric Caldwell.  At approximately 11:50 a.m., on Alpine Avenue in the City of Walker, Michigan, police officers conducted a traffic stop of the vehicle for an expired license plate violation.  Detectives Pittman and Fox testified that they were two of several officers from the Kent Area Narcotics Enforcement Team (KANET) present at the stop, as they had obtained a search warrant for both Mr. Caldwell's residence and the Chevrolet Suburban in relation to a narcotics investigation.  Detective Pittman testified that he approached the driver's side door, removed Mr. Caldwell from the vehicle, and placed him in custody in a police vehicle.

Detective Fox testified that he approached the passenger side of the Suburban, introduced himself to the occupant, being Defendant, and opened the vehicle door.  Detective Fox testified that he did not recognize Defendant as anyone he knew.  He informed Defendant that he was with the sheriff's office and explained that they were conducting a narcotics investigation and had a search warrant for the vehicle.  Detective Fox asked Defendant to step out of the vehicle, and Defendant complied.

Detective Fox testified that after Defendant stepped out of the car, he asked Defendant if he could "search his person," to which Defendant replied that he could.  Detective Fox testified that while there are "a lot of people that use the term pat-down or check you for weapons or something like that," he has always asked people at the very start if he can search their person because if they say yes, he knows he has access to search their entire person until they tell him to stop.  He testified that as a narcotics agent, he has made it a habit to ask the question in that

particular way to ensure he has consent to search the whole person, including the person's pockets, to see what they have on them.[2]  Detective Fox further testified that his responsibility on the scene of a traffic stop when approaching the passenger side of a vehicle is to also ensure the safety of his partners during the stop.

Defendant asserts in his brief that Detective Fox conducted a pat-down search of his North Face jacket for weapons, but then proceeded to search the inside pockets of his jacket as well, to which he had not consented.  At the hearing, Detective Fox testified that he first searched the small of Defendant's back and then Defendant's pockets.  While he did not recall which pocket, he recalled finding in one of them a bank envelope.[3]  Detective Fox looked inside the envelope and found two cashier's checks from JP Morgan Chase Bank in the amounts of $119,000 and $29,951.76.  He also found in a bank envelope a large amount of cash, which the parties do not dispute was $2,500 in $100 bills.  Detective Fox testified that the large amount on the checks piqued his interest because he had never seen a check for over a hundred thousand dollars during the course of his investigations.  He also noticed what appeared to be a ledger for cash on the outside of the envelope.[4]  Detective Fox testified that the name "Mosby," was on both cashier's checks, and that the name raised alarm bells in his mind.  He explained that "is typically because I've heard the name in association with a drug investigation."  Detective Fox took possession of the envelopes and placed them on the inside dashboard of the Suburban.  As for Defendant's

---

[2] Detective Fox testified that he has been told many times by subjects of narcotics investigations that when they were pulled over, they got scared and tried to hide the narcotics or pass them off to a passenger.

[3] At the hearing, Detective Fox recalled there being only one bank envelope containing both the checks and the cash, although it is undisputed that there were actually two envelopes.  Agent Guidice testified that the cash was located inside one envelope and the cashier's checks may have been inside individual envelopes.

[4] Detective Fox testified that there was either writing on, or something with writing stuck on, the envelope containing the physical cash.  Agent Guidice testified that there was a yellow sticky note on the envelope containing the cash, which included reference to both amounts of money and locations.  She explained that the note indicated sums of money and locations, such as "$30,000 shoe box."  She believed these to be references to amounts of money the DEA had seized earlier that same day and the locations from where the money had been seized.

identity, Detective Fox could not recall whether Defendant had shared his name or whether he had

seen it on Defendant's driver's license during the search.

Detective Fox stepped away from Defendant, who remained in the presence of other

officers, and conferred with some members of his KANET team about the name Mosby.  One of

them shared their belief that he was the target of a DEA investigation.  Detective Fox called his

contact person at the DEA, who immediately put him in touch with Special Agent Guidice.  Special

Agent Guidice advised Detective Fox that Defendant was indeed the subject of a DEA

investigation, and that there had been an operation conducted earlier that morning involving

Defendant.  Special Agent Guidice informed Detective Fox that she would come to the scene to

take possession of the checks and cash.  Both Detective Fox and Special Agent Guidice testified

that Detective Fox handed the checks and cash to Special Agent Guidice when she arrived on the

scene.  As for the duration of the encounter, Detective Fox testified that no more than 5 minutes

passed from the time he took the money and checks from Defendant to when Special Agent

Guidice instructed him to hold onto them until she arrived.  Detective Fox further testified that the

entire exchange lasted approximately 20-30 minutes in total.

While the parties do not dispute that Defendant was placed in the back of a detective vehicle

and later dropped off at Mr. Caldwell's residence, where he was free to go, they disagree about

how long Defendant had been detained and whether he had voluntarily entered the detective

vehicle or was instructed to do so by officers on the scene.  Detective Fox testified that he believed

Defendant had accepted an offer to sit in the vehicle to get out of the rain and receive a ride to Mr.

Caldwell's residence, but he clearly lacked personal knowledge, and Defendant did not testify at

the hearing.  In any event, the issue is not particularly relevant to the Court because the crux of the

issue is the scope of Defendant's consent to be searched upon exiting the Suburban.

Special Agent Guidice testified that when she arrived at the scene of the traffic stop, she re-introduced herself to Defendant, whom she had encountered that morning, and informed him that the DEA would be seizing the cashier's checks and cash.  Special Agent Guidice also provided limited background testimony about her involvement in a larger DEA wire-tap investigation that involved Defendant.  She testified that she had previously conducted intelligence briefings with all KANET officers, and that Defendant's name was discussed numerous times.  Special Agent Guidice testified that both cashier's checks included reference to "Mosby's Popcorn, LLC," which was relevant to her investigation of Defendant and would have been disclosed to KANET officers, including Detective Fox, during one of the intelligence briefings that occurred close in time before the October 27, 2020 stop of the Suburban.[5]

According to the government, shortly after the traffic stop, Defendant visited a local Chase bank branch to report that he had lost the cashier's checks, and he signed bank affidavits seeking replacements (ECF No. 205 at PageID.768-769).  Investigators later obtained a seizure warrant for the funds represented by the cashier's checks and $2,500 cash (*id.* at PageID.769).  The grand jury returned a Superseding Indictment on January 27, 2021 (ECF No. 57), and a Second Superseding Indictment on September 22, 2021 (ECF No. 185), adding two charges of Bank Fraud and expanding the forfeiture allegations to include the cashier's checks and cash seized from Defendant.

## II.    ANALYSIS

Defendant essentially makes three arguments.  First, he claims the officers illegally detained him, searched him for weapons, and seized the envelopes because "the purpose of the

---

[5] Special Agent Guidice testified that Defendant's name was shared as part of every intelligence briefing related to her investigation for a period of months, and that a briefing was held both on the night before she executed a search warrant on Defendant's home and on the morning of October 27, 2020.

alleged stop of Eric Caldwell's vehicle for an expired license plate had concluded by the detention of Eric Caldwell prior to the search."  (ECF No. 199 at PageID.708-710) (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968) (establishing rule that "a reasonable search for weapons for the protection of the police officer" based upon reasonable suspicion is permissible "regardless of whether [the officer] has probable cause to arrest the individual for a crime"); *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) ("[l]ike a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop … and related safety concerns") (internal citations omitted)).  Second, he claims that while he consented to a pat-down search for weapons, he did not consent to a search of "the inside pockets of his jacket" or of "the two bank envelopes" which would not fall within the permissible scope of a *Terry* search (ECF No. 199 at PageID.710-711).  Third, Defendant argues that "the cashier's checks and $2,500 were illegally seized within minutes of the illegal search … making it impossible … to be purged of the primary taint" of the illegal seizure, thus requiring that the evidence be suppressed (*id.* at PageID.714).

The Government contends that the seizure of evidence at the time of the traffic stop was lawful because Defendant had consented to a general search of his person (ECF No. 205 at PageID.770).  Specifically, the Government asserts that: (i) the search was reasonable under the totality of the circumstances because Defendant freely and voluntarily consented to a search of his person (*id.* at PageID.773); (ii) the seizure of the envelopes was reasonable as the searching officer was allowed to "briefly investigate the circumstances that aroused [his] suspicion" following their discovery (*id.* at PageID.774-775) (citing *United States v. Place*, 462 U.S. 692, 706 (1983)); (iii) and the collective knowledge of the KANET officers and Special Agent Guidice led to probable cause to seize the evidence (*id.*) (citing *United States v. Hensley*, 469 U.S. 221, 230-231 (1985)).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV.  "The stop and detention of a motorist is a seizure under the Fourth Amendment" and includes seizure of passengers.  *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000); *see Brendlin v. California*, 551 U.S. 249, 251 (2007); *United States v Stepp*, 680 F. 3d 651, 661 (6th Cir 2012).

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable … subject only to a few specifically established and well-delineated exceptions.'"  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  *Id.*

At the hearing, Defendant's counsel properly acknowledged that it was not per se unreasonable for Detective Fox to approach the passenger door of the Suburban, instruct Defendant to exit the vehicle, and ask him some questions, at least to dispel any concern about weapons.  Under the relevant legal standards, the key factual question is whether, preceding the ensuing search, Defendant had consented to a general search of his person, justifying the police officer's search that led to the discovery and seizure of the bank envelopes, or merely to a pat-down search for weapons.  Defendant, as the proponent of the motion to suppress, generally bears the burden to establish that his Fourth Amendment rights were violated.  *See Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)  Ordinarily, in a *Terry* analogous stop of a motor vehicle, an officer must have "reasonable suspicion to go beyond the purpose of the stop," such as that the individual was

engaged in criminal activity, *United States v. Sosa*, 104 F. Supp. 2d 722, 727 (E.D. Mich. 2000), or that the individual is armed and dangerous, *Terry*, 392 U.S. at 27.

Where, as here, the government "seeks to rely upon consent to justify the lawfulness of a search, [the government] has the burden of proving that the consent was … freely and voluntarily given." *Bumper v. N. Carolina*, 391 U.S. 543, 548 (1968); *see United States v. Lee*, 793 F.3d 680, 685 (6th Cir. 2015) (government has the burden to show consent "was not the result of coercion, duress or submission to a claim of authority"); *United States v. Williams*, 754 F.2d 672, 674-675 (6th Cir. 1985) (same). Consent, which may be express or implied, is a voluntary waiver of Fourth Amendment rights. *Schneckloth*, 412 U.S. at 235. "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." *Carter v. Parris*, 910 F.3d 835, 840 (6th Cir. 2018) (quoting *United States v. Hudson*, 405 F.3d 425, 441 (6th Cir. 2005). Consent "must be prove[n] by clear and positive testimony." *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir. 1977); *see United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999) (same).

In this case, Defendant expressly indicated that he does not dispute the *validity* of his consent, but solely the *scope* of that consent. Detective Fox testified that he asked for Defendant's general consent to search his person and that Defendant said that he could conduct a search. No evidence was provided to this Court to rebut Detective Fox's testimony. No evidence was provided to suggest that Defendant's consent was withheld or involuntary. And no evidence was provided to suggest that Defendant otherwise limited the scope of Detective Fox's search to a pat-down for weapons. With no evidence to the contrary, and finding Detective Fox to have given credible testimony, the Court finds that defendant did consent to a search of his person and did not take steps to limit that search in the process. Therefore, even though Defendant was temporarily

"seized" and not "free to leave" the area at the time he exited the Suburban, it is uncontroverted that Defendant did consent to a general search of his person.[6]

Thus, this Court concludes that the government has met its burden to show by clear and positive proof that Defendant's consent was "freely and voluntarily given and was not the result of coercion, duress or submission to a claim of authority." *Lee*, 793 F.3d at 685; *McCaleb*, 552 F.3d at 721.

Based on the foregoing, this Court concludes that Defendant has not shown that the search was unconstitutional.

---

[6] While the Court notes that the extent of the search into Defendant's pockets and the bank envelopes may have exceeded the permissible scope of a warrantless pat down under *Terry* and its progeny, it does not reach this issue. Contrary to the arguments in Defendant's brief, there was no testimony that the consent provided was limited to a pat-down for weapons. Additionally, Detective Fox's testimony clearly stated that neither the request to search nor the consent provided was limited to a pat-down for weapons.

**III.    CONCLUSION**

Defendant's Motion to Suppress (ECF No. 199) is denied.  An Order consistent with this Opinion will be entered.


Dated:  February 28, 2022                                        /s/ Jane M. Beckering
                                                                            JANE M. BECKERING
                                                                            United States District Judge